**FORT WORTH & RIO GRANDE RY. CO. et al. v. EVANS et al.**

No. 14198.

Court of Civil Appeals of Texas. Fort Worth.

April 4, 1941.

Rehearing Denied May 9, 1941.

E. G. Nahler, of St. Louis, Mo., and Allen & Gambill, of Fort Worth, for appellants.

M. L. Swartzberg and Ernest May, both of Fort Worth, for appellees.

McDONALD, Chief Justice.

This suit was brought by Marshall R. Evans and five other persons against the Fort Worth & Rio Grande Railway Company and the St. Louis, San Francisco and Texas Railway Company, seeking to recover from the two railway companies, jointly and severally, for certain benefits alleged to be due the plaintiffs by virtue of the terms of an agreement made and entered into in May of 1936, at Washington, D. C., between various carriers and their employees. Three of the plaintiffs did not recover in the trial court, and have not appealed. The two railway companies have appealed from judgments against them, jointly and severally, in favor of the plaintiffs, Marshall R. Evans, H. L. Mahaffey and J. H. Richards.

The agreement in question was executed by the Brotherhood of Locomotive Engineers and other organizations representing railway employees, and by many carriers, including those sued herein. The scope and purpose of the agreement may be found in the following quoted provisions:

"Section 1. That the fundamental scope and purpose of this agreement is to provide for allowances to defined employees affected by coordination as hereinafter defined, and it is the intent that the provisions of this agreement are to be restricted to those changes in employment in the Railway Industry solely due to and resulting from such coordination. Therefore, the parties hereto understand and agree that fluctuations, rises and falls and changes in volume or character of employment brought about solely by other causes are not within the contemplation of the parties hereto, or covered by or intended to be covered by this agreement.

"Section 2(a). The term 'coordination' as used herein means joint action by two or more carriers whereby they unify, consolidate, merge or pool in whole or in part their separate railroad facilities or any of the operations or services previously performed by them through such separate facilities.

\* \* \* \* \*

"Section 12. If any carrier shall rearrange or adjust its forces in anticipation of a coordination, with the purpose or effect of depriving an employee of benefits to which he should be entitled under this agreement as an employee immediately affected by a coordination, this agreement

shall apply to such an employee as of the date when he is so affected."

The contract contains provisions determining the amounts of benefits to be paid. It also contains a provision relating to disputes or controversies arising thereunder, as follows:

"Section 13. In the event that any dispute or controversy arises (except as defined in Section 11) in connection with a particular coordination, including an interpretation, application or enforcement of any of the provisions of this agreement (or of the agreement entered into between the carriers and the representatives of the employees relating to said coordination as contemplated by this agreement) which is not composed by the parties thereto within thirty days after same arises, it may be referred by either party for consideration and determination to a Committee which is hereby established, composed in the first instance of the signatories to this agreement. Each party to this agreement may name such persons from time to time as each party desires to serve on such Committee as its representatives in substitution for such original members. Should the Committee be unable to agree, it shall select a neutral referee and in the event it is unable to agree within 10 days upon the selection of said referee, then the members on either side may request the National Mediation Board to appoint a referee. The case shall again be considered by the Committee and the referee and the decision of the referee shall be final and conclusive. The salary and expenses of the referee shall be borne equally by the parties to the proceeding; all other expenses shall be paid by the party incurring them."

The case was tried before the court, without a jury. No findings of facts or conclusions of law were filed by the trial court, nor were they requested by either of the parties.

The two defendant railway companies were subsidiaries of the St. Louis-San Francisco Ry. Co., a Missouri corporation, commonly known as the "Frisco". The Gulf, Colorado & Santa Fe Ry. Co., a Texas corporation, was a subsidiary of the Atchison, Topeka & Santa Fe Ry. Co., commonly known as the "Santa Fe". The two parent companies will be designated as the Frisco and the Santa Fe.

At all times material herein, and since 1933, the Frisco had been in bankruptcy, operated by trustees appointed by the United States District Court, at St. Louis. The evidence shows without dispute that the two Texas subsidiaries, defendants herein, had been operating at a loss aggregating nearly $6,000,000 during the ten years next preceding 1936. The Fort Worth & Rio Grande had been losing on an average about $300,000 per year. On January 1, 1936, a contract was signed providing for the transfer of the ownership of the Fort Worth & Rio Grande from the Frisco to the Santa Fe, to be accomplished by a transfer of the capital stock and bonds of the company, which were owned by the Frisco. The same contract provided that certain properties of the Fort Worth & Rio Grande should be leased to the Gulf, Colorado & Santa Fe Ry. Co., the Santa Fe subsidiary operating in Texas, and that the remainder of the Fort Worth & Rio Grande properties should be sold to the St. Louis, San Francisco & Texas Ry., the other Frisco subsidiary in Texas, and that the latter company should have trackage rights over a certain part of the main line of the Fort Worth & Rio Grande, 1000 feet in length. The properties to be purchased by the St. Louis, San Francisco & Texas from the Fort Worth & Rio Grande included a half interest in $8\frac{3}{100}$ths of a mile of a certain belt line situated in Fort Worth, provision being made for its joint use. The contract was made subject to authority being obtained from the bankruptcy court at St. Louis, and from the Interstate Commerce Commission. The bankruptcy court authorized the trustees to make the proposed deal, in July, 1936, and the Interstate Commerce Commission gave its authorization on December 31, 1936. Transfers of the properties appear to have been completed in March of 1937.

On February 15, 1936, certain changes were made in the offices of defendants at Fort Worth, whereby eight positions were abolished, and one new position created. There followed a period of several weeks in which employees who were displaced, or at least some of them, exercised seniority rights which in turn displaced other employees, who in turn exercised their seniority rights, and so on, with the result that the plaintiffs, according to their allegations, eventually lost their positions. Plaintiffs had been employed on some joint basis by both defendants.

Plaintiffs contend that the transactions between the Frisco and Santa Fe constituted a "coordination" of the kind contemplated in the contract, and that the

office forces were rearranged or adjusted in anticipation of the alleged coordination. Defendants contend that the transfers of the railroad properties were not a coordination, within the meaning of the agreement, that the office forces were not reduced in anticipation of the proposed sale of the Rio Grande properties, that each of the plaintiffs who recovered judgment voluntarily quit the employ of defendants for employment in other lines of work, and that plaintiffs failed to prove that they had exhausted the remedies provided them in the contract.

While our disposition of the case does not require a decision of the question, we do not believe that the transfers of properties described constituted a coordination within the meaning of the contract. Giving the words their ordinary meaning, the Frisco and Santa Fe did not "unify", "consolidate", "merge" or "pool" their separate properties. The Frisco simply sold to the Santa Fe some properties which had been losing money for many years. The arrangement for joint use of the two short distances of track were not shown to have had the slightest effect upon the amount of office workers needed to handle the business of the railroads in question.

Nor do we believe that there is any evidence of probative force to support the implied finding of the trial court that the changes in the office forces were made in anticipation of the alleged coordination. The only testimony offered on this point related to some remarks, of a most general nature, quoted by plaintiffs as having been made by one or two of the employees in the more responsible positions in the office. Defendants placed on the stand the chief auditing officials of defendants and of the Frisco System. The latter testified regarding the operating losses of the Texas subsidiaries, and testified explicitly and in detail regarding the reasons for making the changes in question. From year to year, prior to 1936, the office force had been gradually cut more than half, on account of diminishing business. The testimony of the auditors shows without dispute that the changes were brought about partly by instituting improved methods of auditing, accounting and bookkeeping, and partly by distributing the work among employees who were not being kept busy under the old routine.

Each of the three plaintiffs who recovered judgment either resigned, or requested to be released, and sought and obtained employment in other lines of work. Although they offered testimony suggesting that they may not have been permitted to exercise their seniority rights, none of them made any attempt to avail themselves of the remedies provided in the so-called working agreement, or clerk's rules, applicable in such cases. This latter was not the agreement executed in Washington in 1936, but was a prior agreement governing the hours of service and working conditions of these employees.

The chief obstacle to recovery by plaintiffs, as we view the case, is Section 13 of the Washington agreement. It is our opinion that the rules of law announced in the following cases are conclusive, plaintiffs having failed to allege or prove that they exhausted the remedies provided in Article 13, and having offered no reason for not so doing. St. Louis, B. & M. Ry. Co. v. Booker, Tex.Civ.App., 5 S.W.2d 856; Harrison v. Pullman Co., 8 Cir., 68 F.2d 826; Cousins v. Pullman Co., Tex.Civ. App., 72 S.W.2d 356; Mallehan v. Texas & Pacific Ry. Co., Tex.Civ.App., 87 S.W.2d 771; Swilley v. Galveston, H. & S. A. Ry. Co., Tex.Civ.App., 96 S.W.2d 105; Wyatt v. Kansas City Southern Ry. Co., Tex. Civ.App., 101 S.W.2d 1082.

Judgment of the trial court left undisturbed in so far as it denies a recovery to the plaintiffs, W. R. Edwards, John M. Freeman and Mrs. Gertrude Moody, who did not appeal therefrom. Judgment of the trial court reversed in so far as it awards a recovery to the plaintiffs, Marshall R. Evans, H. L. Mahaffey and J. H. Richards, and rendered in favor of the defendants.

## On Motion for Rehearing.

In appellees' motion for rehearing, complaint is made of our finding that the three plaintiffs who recovered judgment in the trial court either resigned or requested to be released from their employment, especially in so far as the finding relates to the appellee J. H. Richards. Upon reexamination of the record we are convinced that it does not show that Richards expressly resigned or requested to be released from his employment. This does not alter the result of the case.

We believe that our findings are otherwise correct.

Appellees' motion for rehearing is overruled.